GERRY ET AL., RESPONDENTS, v. THE BISMARCK BANK
ET AL., APPELLANTS.

[Submitted January 27, 1897.   Decided February 8, 1897.]

*Corporation—Fraudulent Act of Directors—Mortgage of Mining Claims—Action by Minority Stockholders.*

The president of a mining corporation bought a mine adjacent to the property of the Company for $45,000. He and another director "C" who together owned or controlled nearly two-thirds of the stock of the company then falsely represented to the plaintiffs who are stockholders and one of whom is a director of the company, that the mine had cost $95,000 and was actually worth $110,000, that unless the company bought the mine it would be involved in an expensive litigation, and that if the plaintiffs did not give their consent to the purchase and to the execution of a mortgage, they had control of enough stock to act without it. There were five directors of the company. The plaintiffs relying upon the truthfulness of the representations agreed to allow their stock to be voted in favor of a mortgage to be executed by the company in carrying out the purchase. Subsequently a meeting of the board of directors was held at which there were present four directors including the president and his co-conspirator, and thereupon a resolution was adopted to purchase the property from the president, he not voting; and at the same meeting it was also resolved that a stockholders' meeting should be called to authorize the execution of a mortgage up on the property of the company, including the mine thus bought, to secure the purchase price of the latter. The capital stock of the company is divided into 300,000 shares; at this meeting of the stockholders 268,050 shares were represented; of which the president owned 47,501 shares, and 133,395 shares were owned by the wife of "C," and were controlled by "C;" there were no votes cast against the resolution to mortgage, and only 220,548 were cast in its favor, as the president did not vote and as "C" did not vote the one share held by him. The mortgage was executed to a trustee for the bondholders; upon default in the mortgage, foreclosure proceedings were commenced; thereupon plaintiffs who are minority stockholders and one of whom is a director, brought this suit to enjoin the prosecution of the foreclosure. *Held,* that the purchase by the board of trustees was fraudulent and invalid as to plaintiffs; *Held,* further, that the mortgage was fraudulent and void under the laws of Montana, because the transaction would not have received the number of votes required, if "C" had not caused the shares of his wife to be voted in its favor.

SAME—The directors of a corporation are trustees, and cannot use their position for their personal profit.

SAME.—After obtaining possession of the mine, the company under the management of "B" and "C" 'expended more money than was expended when the company was earning dividends; thus an indebtedness was incurred which brought about the foreclosure. *Held,* that under the facts of this case "B" having gained an advantage through his own wrong, it was not necessary for plaintiffs to first offer to restore the mine to "B" or place him in *statu quo.*

SAME.—*Held,* that under the facts in this case, plaintiffs could bring this suit without proving or alleging a refusal of the board of directors so to do.

*Appeal from District Court, Silver Bow County.   J. J. McHatton, Judge.*

ACTION by Walter S. Gerry and others against the Bismarck Bank of North Dakota and others. From a decree for plaintiffs and an order denying a new trial, defendants appeal. Affirmed.

Statement of the case by the justice delivering the opinion.

This action was instituted by plaintiffs, a minority of the stockholders of the Bannister Mining Company, a corporation operating in Silver Bow county, Montana, to set aside a deed conveying a certain mining claim to said corporation, and also a mortgage executed by it to a trustee to secure the purchase price of said claim. The defendants are the corporation, four of its five directors, the trustee named in the mortgage, and a stockholder. Certain allegations of the complaint are as follows : Plaintiffs are the owners of about 75,000 shares of the capital stock of the Bannister Mining Company. During the year 1891, Bannister was a trustee and the president of said company, Child was a trustee and treasurer, Anderson was a trustee and secretary, and Beattie was a trustee. In the month of October, 1891, Bannister and Child conspired to cheat and defraud the Bannister Mining Company, and particularly the plaintiffs. In that year Bannister and Child went to Boston, and represented to plaintiffs that Bannister was the owner of the Valley lode claim; that he had paid $95,000 for it; that its value was $110,000; that the vein of the Tecumseh claim (the mine owned and theretofore worked by the Bannister Mining Company) was dipping beneath the Valley, which lay adjacent to the Tecumseh, and that it was necessary for the company to purchase the Valley claim in order to avoid litigation; that they and the other stockholders residing in the West could purchase said Valley claim whether they (plaintiffs) would agree to it or not, but that they desired plaintiffs' consent for the sake of harmony. That all of these allegations were false, and known at the time to be so by said Bannister and Child. That said Bannister had not paid $95,000 for the Valley claim, but, on the contrary, had not paid over $35,000 for the same, and that its value did not exceed $25,000. It

is further averred that plaintiffs believed and relied upon the false representations made to them, and that in pursuance of the conspiracy aforesaid, on November 3, 1891, a meeting of the board of trustees or directors of the Bannister Mining Company was held at Helena, Montana; that there were present at said meeting said Bannister, said Child, and the defendant trustees Beattie and Anderson; that, at said meeting of the trustees, said Child, said Beattie and Anderson (the latter two well knowing of the fraud, and being parties to the conspiracy), voted to purchase the Valley claim; that on December 17, 1891, a stockholders' meeting was held, for the purpose of authorizing the execution of a mortgage on the Valley lode claim, and the Tecumseh mine as well, to secure the purchase price of said Valley claim; that the number of shares voted at said meeting, through said fraud and conspiracy, was 190,898; and that, therefore, there was no legal authorization for the execution of the said mortgage. The complaint, proceeding, states that the mortgage so illegally voted upon was executed to the defendant the Bismarck Bank, as a trustee for said conspiring trustees; and that, in furtherance of the conspiracy, subsequent to its execution the trustee defendants misappropriated funds of the Bannister Mining Company, and thereby procured a default in the sinking fund provided for in the said mortgage; and that the defendant the Bismarck Bank, as trustee, is about to foreclose and sell the mortgaged property. The prayer for relief is that the foreclosure of the mortgage be restrained; that the deed and mortgage both be declared null and void; and that the conspiring trustees be required to account for all sums due by them to the company by reason of the fraud aforesaid. The answer of the defendants denied the allegations of the complaint. The case was tried to the court, without a jury. Judgment was rendered for plaintiffs. The finding, as appears from the decree of the lower court, is ''that the allegations in the plaintiffs' complaint, except as to the allegations that the defendants Bannister, Child and Beattie had fraudulently appropriated to their own use or misapplied any funds of the Bannister Mining Com-

pany, in any sum whatever, were fully sustained and proved.''
The appeal is from the order denying a motion for a new trial,
and from the decree.

*McConnell, Clayberg & Gunn,* for Appellants.

*J. F. Forbis,* for Respondents.

BUCK, J.—After a careful review of the evidence in the
record, we are satisfied that from what the lower court was
justified in finding to be the truth where the testimony was
conflicting, and from what is virtually conceded to be the truth
by the parties to the suit, the following condition of facts is
presented :   E. D. Bannister was a trustee and the president
of the Bannister Mining Company, and the owner of 47,501
shares of the capital stock.   W. C. Child was a trustee, and
its treasurer, and the owner of 1 share of the capital stock,
his wife, Mary Child, being the owner of 133,395 shares.   E.
W. Beattie was a trustee, and the owner of 10,000 shares.   J.
W. Anderson was a trustee, and its secretary, and the owner
of 1 share of stock.   Bannister and Child were the directors
and officers who superintended and directed the operations of
the corporation.   The Valley, an unpatented mining claim,
was adjacent to the Tecumseh, the patented mine belonging to
the Bannister Mining Company, which had yielded some
$66,000 in dividends.   The value of the Valley claim was
largely speculative, and depended chiefly upon its proximity to
the Tecumseh mine.   In the progress of development of the
Tecumseh mine, Bannister, in his official capacity, became
aware that legal complications might possibly result from the
fact that the vein of the Tecumseh showed a tendency to dip
into the Valley ground.   There was no certainty, however,
that these complications would arise.   He thereupon acquired
title in his own name to the Valley, paying or agreeing to pay
therefor the sum of $45,000.   This was all it was ever worth.
Under the pretext that the presence of himself and Child
(whom he had taken into his confidence) was necessary in Bos-
ton, Massachusetts, to manage the exchange of new for old

certificates of stock held by owners residing there, the two men went to that city, at the expense of the company. Taking advantage of the trust reposed in them by virtue of their official positions, and with intent to deceive, they represented falsely to certain of the plaintiffs that Bannister had paid $95,000 for the Valley claim; that the Valley claim was actually worth $110,000; that it was necessary for the Bannister Mining Company to acquire it at the last-named price, for the protection of the lateral rights of the Tecumseh vein; and that, if plaintiffs refused to consent to the purchase, they held control of sufficient stock of the company to buy the Valley without their co-operation. The plaintiffs to whom these representations were made had a reasonable right to, and did, rely upon the truth of the same, and subsequently suffered their shares to be voted, and made no opposition to the transaction. One of the plaintiffs, W. S. Gerry, was a nonresident director of the company. Shortly after the return of Bannister and Child to Montana, a meeting of the board of trustees of the Bannister Mining Company was held, to make the purchase of the Valley claim. The directors present at this meeting were Bannister, Child, Anderson and Beattie. A resolution was passed accepting a written proposition of Bannister for the sale of the Valley claim for $110,000. Bannister did not vote on this resolution, but Child did. The proposal for the sale recited that the purchase price, in the opinion of Bannister, was worth $110,000. Bannister, as president, appointed Child and Beattie as a committee to investigate and report upon the proposition of sale. This committee reported in favor of the purchase at the same meeting. The proceedings of the meeting indicate that they were merely *pro forma*. At the same directors' meeting it was resolved that a stockholders' meeting should be called for the purpose of obtaining authority to mortgage the Tecumseh and Valley properties to secure the purchase price of the latter. Pursuant to this call, shortly afterwards a stockholders' meeting was held, and the mortgage aforesaid was authorized. At this stockholders' meeting, 268,050 of the 300,000 shares of the company's

capital stock were represented, and 220,548 shares were voted in favor of the authorization. There were no shares voted against it. Bannister did not vote his 47,501 shares. Child abstained from voting the 1 share held in his name, but the shares of Child's wife (133,395 in number) were voted by J. W. Anderson, clearly at the instigation of Child himself. Child had his wife assign the stock to one Reeves, who thereupon gave a proxy to vote the same to said Anderson.

The law of Montana (§ 493, Compiled Statutes, 1887) required at least three-fourths of the entire capital stock to be represented at this meeting, and made at least two-thirds of the entire capital stock necessary to any authorization of the mortgage. Without Bannister's 47,501 shares there would not have been a three-fourths representation of the capital stock at the meeting. Under these circumstances, the deed to the Valley mine was executed to the company, and the company executed a mortgage to secure the purchase price thereof. Thereafter, under the management of Bannister and Child, a large sum of money was spent in developement work on the Valley and Tecumseh mines,—a great deal more than had been expended during the period when the Tecumseh mine paid dividends. There was a default in the sinking fund provided for in the mortgage. The testimony is not sufficient to support the lower court in finding that Beattie and Anderson took part intentionally in any conspiracy with Bannister and Child. But, in the view we take of the law applicable to the facts before us, the allegations as to any fraud on the part of Beattie and Anderson become immaterial. From an evidentiary standpoint, it is well to note that Anderson was the owner of only one share of stock, and Beattie's interest was greatly disproportionate to the combined holdings of Bannister and Child's wife.

Was the purchase by the board of trustees of the Valley mine a valid one? We must answer the question in the negative. Of the four directors who were present at the meeting when the purchase was made, two were conspirators. On the theory of the innocence of the other two, their votes should have been cast differently had they been aware of the actual

condition of affairs. So, too, the authorization of the execution of the morgage at the stockholders' meeting is vitiated by fraud. The shares of the wife of Child should not have been voted as they were. Clearly, had the plaintiffs to whom Bannister and Child made the misrepresentations known of the fraud, their shares of the stock would not have been voted as they were. Add the number of shares of the actually deceived plaintiffs (even accepting appellants' estimate of them at about 20,000 only) to the disqualified 133,395 Child shares, and it appears at once that the result, 155 395, deducted from the 220,548 shares voted, leaves only 65,153 shares legally voted in favor of the mortgage. This number falls far short of the two-thirds vote necessary under the statute to have authorized it.

Appellants maintain that the lower court must have rendered its decision upon the theory that Bannister was guilty of constructive fraud,—fraud which the law would imply from any violation of his fiduciary relation as a trustee for the stockholders; and that, inasmuch as plaintiffs' complaint was wholly on the theory of actual fraud, relief cannot be afforded in the present suit for any disregard by Bannister of his fiduciary obligation as to profits. We do not disagree with the general principle that even under our form of procedure the proof must substantially correspond with the allegations relied on for relief, and that a plaintiff cannot allege one cause of action, and then, even if the proofs might justify it, obtain relief on one which is essentially different in character. (See Pomeroy on Code Remedies, § 553 *et seq.*) But does the complaint before us set forth different theories for recovery ? We think not. It contains an averment of a fraudulent conspiracy, and the fiduciary relationship of Bannister and Child to the company is averred only as one of the means whereby the fraud was perpetrated. The latter averment supports the former. The two blend naturally into the gist of the action. Even if any line of demarkation could be preserved between the fraudulent conspiracy as one theory in this complaint, and the violation of the duties of the fiduciary relationship as an-

other, still the two would not be essentially different. Fraud would be the basis of recovery in each.

But it is idle to pursue any such phase of the argument in the view we entertain of the evidence and the cause of action in the complaint. The lower court found, and with sufficient evidence to sustain it, both actual and constructive fraud,— the latter merely as incidental to the former. The determination of the appeal is not difficult. That a trustee should not be allowed to profit by his trust is a well-known fundamental doctrine of equity. No evasions, no technical subtlety of reasoning, no empty distinctions, should be tolerated when the assertion of this principle becomes necessary. It is true that when the motives of a trustee in the neglect of his duty are not essentially bad, or are readily reconcilable with ordinary honesty of purpose, certain courts have applied this rule leniently. It is true that, when no patently wilful violation of duty appears, many judges have shown a disposition to check its force. It is true that weak toleration from the bench of frail, but penitent, humanity, has often apparently robbed the principle of its very life. But such precedents serve only to increase plausible devices for evading its consequences. They encourage the natural tendency of designing selfishness to substitute the vague expression "business enterprise" for "business honesty." When, however, a case arises like the one before us, where, to an attempt to make profit through a trust relation, there is added the element of actual fraudulent representations, in order to attain the end, then, certainly, no leniency should mingle with the application of the principle. It must be administered sternly and unhesitatingly. Appellants cannot justly complain of the judgment. In his own testimony, the witness Bannister states : "I never told any person, and there is no person who ever knew exactly, what the Valley cost me until I was interrogated here in court. I gave them (plaintiffs) no figures as to the cost of the Valley. I said : 'I am not going to tell you what this cost me. That don't make any difference. This ($110,000) is what it is worth.'" Again, the following question was put to him :

"So it was not the good of the company you were looking at so much as the good of E. D. Bannister?" His answer was: "The Bannister family, yes sir; they are first."

Appellants urge that Mr. Bannister must first be put in *statu quo* before relief can be granted in this suit. Having gained an advantage, wrong from its very inception, he is in no position to make any such demand.

The allegations of plaintiffs' complaint and the evidence answer the contention that, before the plaintiffs could institute this suit, it was necessary for them to request the board of directors to institute an action, and to prove a refusal on its part. With two of the four directors in charge of the affairs of the corporation conspiring, such a demand would have been idle. The history of the suit subsequent to the filing of the complaint shows that all four of the resident directors united in resisting the assertion of the corporation rights, and the utter futility of any such demand is thus made more manifest. (See Pomeroy on Equity Jur., § 1095.)

We cannot pass upon any rights which the American National Bank may have acquired under this mortgage, as the holder of bonds for purposes of collateral security. The said bank is not a party to this suit, and Bannister's sworn answer asserts that he is the sole owner of all said bonds.

The order denying the motion for a new trial is sustained. The judgment of the lower court is affirmed, but the case is remanded, with directions to the district court to modify the findings as to Anderson and Beattie, recited in the decree, in accordance with the views herein expressed.

*Modified and affirmed.*

PEMBERTON, C. J., and HUNT, J., concur.