BARKER, RESPONDENT, *v.* MONTANA GOLD, SILVER,
   PLATINUM AND TELLURIUM MINING CO. ET AL.,
   APPELLANTS.

(No. 2,371.)

(Submitted March 11, 1907.   Decided March 21, 1907.)

(89 Pac. 66.)

*Mining Corporations—Directors—Trustees Ex Maleficio—Stock
   —Equity—Innocent Purchasers—Burden of Proof—Notes—
   Transfer—Laches.*

Mining Corporations—Stock—Transfer—Innocent Purchasers—Equity.
   1.   Evidence examined, and held to show that a vendee of certain
   shares in a mining corporation, of which the vendor was only the
   equitable owner, and the transfer of which on the books of the com-
   pany was sought in an action by the vendee, was not an innocent pur-
   chaser without notice, but acquired only such equities as the vendor
   had.
Same—Directors—Personal Profit—Trustees *Ex Maleficio.*
   2.   Directors of a corporation who have derived personal profit from
   their dealings with corporate property will be held trustees *ex male-
   ficio* as to such profits, for the benefit of the company and those stock-
   holders who have been injured by such dealings.
Same—Directors—Purchase of Stock with Corporate Funds—Innocent Pur-
   chasers—Burden of Proof.
   3.   Where it appeared that directors of a mining corporation used its
   funds in purchasing shares of its stock for themselves, without proo
   that they had the right to do so, they became trustees *ex maleficio*
   of the property so bought, for the benefit of the company, to the ex-
   tent to which they used such funds; and the buyer of a portion of the
   stock from one of the directors, with full knowledge of the facts sur-
   rounding the transaction, who sought to compel a transfer of it on the
   books of the company, had the burden of showing that the directors
   violated no duty owed by them to the company in the premises.
Same—Directors—Using Corporate Funds—Notes—Trusts.
   4.   Where directors of a mining corporation gave their personal notes
   in purchasing shares of its stock and later without authority used
   company funds to pay such notes in part, the proportion of the stock
   paid for with the company's own money was impressed by the trust
   resulting from the purchase, in favor of the company, and the fact
   that the buyers had previously executed their notes therefor did not
   relieve it of the trust character stamped upon it by their conduct.
Same—Stock—Title of Equitable Owner.
   5.   A. and B., the latter at the time being a director of a mining
   corporation, purchased a large block of its stock and agreed that C.,
   also a director, should have a one-third interest in it.   Notes in pay-

ment were issued to the seller, signed by all three. The stock was taken in the name of A. and B. One of these notes was paid by A. out of his own money and others either directly or indirectly out of the company's funds. C. thereafter paid the balance due on them in compromise of a suit, brought by the payees for collection, with interest. *Held,* that C. was entitled to the proportion of the shares, represented by the certificate issued to A. and B., that the amount paid by him personally, excluding interest, bore to the full amount of the notes given in payment of the stock.

Same—Stock—Transfer—Party in Interest—Findings—Review—Conflicting Evidence.

6. In an action to compel a mining company to issue to plaintiff a certificate for shares of its capital stock, where the evidence was conflicting as to whether or not plaintiff was the real party in interest and did not preponderate against the court's finding resolving the question in plaintiff's favor, the finding will not be disturbed on appeal.

Same—Stock—Transfer—Duty of Officers—Laches.

7. A purchaser of shares of mining stock from the equitable owner, whose ownership was not disputed by his associates in whose name the stock was held at the time, was not precluded by laches from having the stock transferred on the books of the company, since its officers are bound to make the transfer at any time when properly directed to do so, and no lapse of time will protect them from the consequences of a refusal.

*Appeal from District Court, Cascade County; J. B. Leslie, Judge.*

ACTION by Violet Barker against the Montana Gold, Silver, Platinum and Tellurium Mining Company, T. C. Power, A. C. Gormley, and others. From a judgment for plaintiff, defendants mining company, Power, and Gormley appeal. Remanded, with directions to modify, and new trial granted *nisi.*

*Mr. A. C. Gormley,* for Appellants.

The purchasers of certificate No. 571 took the same in trust for the company. That an implied or constructive trust in said stock was created by reason of the foregoing facts is clearly shown by the following Code provisions and authorities: Civ. Code, secs. 2118, 2180, 2952, 2959, 2970-2981; Perry on Trusts, sec. 166; 1 Pomeroy's Equity Jurisprudence, sec. 165; 2 Pomeroy's Equity Jurisprudence, secs. 1038, 1053; 15 Ency. of Law, 1123, 1132, 1140; 28 Ency. of Law, 910, 925, 1064, 1108-1110; *Bowler* v. *Curler,* 21 Nev. 158, 37 Am. St. Rep. 501, 26 Pac. 226;

*Springer* v. *Young,* 14 Or. 280, 12 Pac. 400; *Muller* v. *Buyck,* 12 Mont. 368, 30 Pac. 386.

The plaintiff was not a *bona fide* purchaser of this stock. It may be stated as a general rule that, in order to entitle a person to protection on the ground that he is a purchaser for value and without notice, he must have acquired title to the subject matter of his purchase, and have given a valuable consideration therefor, in good faith, and before receiving actual or constructive notice of any adverse claim or interest. (23 Ency. of Law, 479.) The purchaser of an equitable, as distinguished from a legal, title, will not be afforded protection as a *bona fide* purchaser as against the holder of a prior equity. (Id.; *Taylor* v. *Weston,* 77 Cal. 534, 20 Pac. 64; 10 Cyc. 632.)

The giving of the negotiable promissory notes of the purchaser is not a payment of value, at least in a case so circumstanced that a court of equity can prevent their enforcement. (23 Ency. of Law, 490; 10 Cyc. 636.) If at any time before the sale is completed and while the purchaser can without damage abandon his contract and withdraw from the transaction, actual or constructive notice of a prior equity is received by him, and he thereafter completes his purchase, his claim to protection as a *bona fide* purchaser is defeated. (22 Ency. of Law, 517, 518.)

Even though plaintiff became the owner of this stock, her suit is barred by laches. In cases involving mining property or mining stocks, where in a very short time there might be great fluctuations in values, a person seeking relief should be held to a greater degree of diligence than in other cases. (*Wolf* v. *Great Water Power etc. Co.,* 15 Mont. 49, 38 Pac. 115; 18 Ency. of Law, 99-103; *Hayward* v. *National Bank,* 96 U. S. 611, 24 L. Ed. 855.)

*Mr. Sam. Stephenson,* for Respondent.

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

This action was brought by plaintiff, the respondent, to obtain a judgment compelling the defendant company, by its presi-

dent and secretary, T. C. Power and A. C. Gormley, to issue to her a certificate for 133,317 shares of its capital stock. The complaint was filed on April 26, 1905.

The plaintiff alleges, in substance, that she purchased this number of shares from one T. E. Collins on August 22, 1903; that at that time the stock stood in the name of one J. T. Armington and one J. C. E. Barker, being included in certificate No. 571, theretofore issued to them for 300,051 shares; that, though issued to them, the said Collins in fact owned 133,317 of the shares represented by the certificate, and that they held these shares in trust for him; that, prior to the bringing of the action, she surrendered the certificate to said Power and Gormley, properly indorsed, and demanded the transfer to be made to her, but that her demand was refused. Armington and Barker were made parties defendant for the purpose of having them set forth any interest they might have in the stock. They suffered default by failing to appear.

The defendant company and its president and secretary, in their answer, admit the demand of plaintiff and their refusal to make the transfer and issue the shares, but deny that Collins was then, or ever had been, the owner of 133,317 shares, or any of them. They also allege the following special defenses: (1) That the stock in controversy was a part of a purchase made by Armington and Barker from J. T. and E. J. Anderson, who had been at one time the owners thereof; that Armington and Barker were at the time directors of the company and, respectively, its secretary and president; that the consideration for the stock was paid out of the moneys in the treasury of the company and belonging to it, and that by reason of this fact the stock became the property of the company, and was acquired and held by Armington and Barker as trustees for its benefit: (2) that in no event did plaintiff acquire the title to the stock by her purchase from Collins, for the reason that it at no time stood in the name of Collins on the books of the company, as is required by its by-laws; (3) that one David L. S. Barker, and not the plaintiff, is the real party in interest; (4) that plaintiff's claim is barred by

her laches; and (5) that plaintiff is estopped by her conduct from asserting her claim. Upon these defenses there was issue by reply.

The court made findings of fact and conclusions of law in favor of the plaintiff, and directed judgment to be entered accordingly. The cause is before this court on appeal by the company and Power and Gormley from an order denying them a new trial.

From the evidence introduced by the parties, the court found, substantially, as follows: That on May 9, 1896, the defendant company, by its duly authorized officers, and under the seal of the corporation, issued to J. T. Armington and J. C. E. Barker its certificate, bearing No. 571, for 300,051 shares of the capital stock of the corporation, which by its own provisions was transferable upon the books of the company upon surrender thereof, properly indorsed; that, while such certificate on its face purported to be owned by the defendants J. C. E. Barker and J. T. Armington, as a matter of fact 133,317 shares represented by it were owned at all times from its issuance and delivery up to August 22, 1903, by T. E. Collins, subject, at the date last mentioned, to a lien of some nature, held by Lavina A. Collins, the wife of T. E. Collins, and was held in trust by Barker and Armington for Collins, with the understanding that it should be transferred to him on demand; that on August 22, 1903, said Collins represented to the plaintiff that he was the owner of the 133,317 shares represented by the certificate, that he was entitled to sell the same and have it transferred on the books of the company, and that thereupon the plaintiff, for a valuable consideration, purchased said 133,317 shares from Collins, as well as the interest of Lavina A. Collins, and that thereupon Barker, Armington, and Collins indorsed the certificate by indorsement showing the interest that she had purchased from Collins, so that she might have the shares transferred on the books of the company; that, after this indorsement was made, the certificate was delivered to her with the full consent of Collins and his wife, and that she has ever since then been, and now is, entitled to have

the same transferred on the books of the corporation and to have issued to her a certificate for said 133,317 shares; that, prior to the institution of this action, the plaintiff surrendered the certificate to the corporation and demanded of the officers of the corporation, said Power and Gormley, that they cancel the same and reissue to her a certificate for 133,317 shares, but that they wrongfully refused, and still wrongfully refuse, to cancel the certificate and reissue said number of shares to her; that the stock is reasonably worth five cents per share; that Barker and Armington, at all times after the issuance and delivery of said certificate to them, recognized the ownership of T. E. Collins therein, and held the 133,317 shares as his trustee; that there is no evidence that J. C. E. Barker, J. T. Armington, and T. E. Collins, or any of them, used the moneys belonging to the defendant company for the purpose of purchasing said stock, or any part thereof, or for the purpose of paying the purchase price, or any part thereof, or that they used any money belonging to the company for that purpose, and that they purchased the stock with their own money; that the plaintiff, Violet Barker, purchased said 133,317 shares of stock from Collins, and paid therefor a valuable consideration, and that she did this without notice of any right, claim, title, or interest of the defendant company to such shares or any of them; and that the plaintiff has not been guilty of laches in the prosecution of her suit, is not estopped by any act on her part from the prosecution thereof, and that her action is not barred by the statute of limitations.

Upon the request of the defendants, the court made further supplemental findings, substantially as follows: That the certificate of stock No. 571 for 300,051 shares, of which plaintiff claims title to 133,317 shares, after issuance to Armington and Barker, was held by the Anderson brothers as collateral security for the balance of the unpaid purchase price thereof, until final payment some years after the sale; that, at the time of the purchase of the stock, Barker and Armington were, respectively, the president and secretary of the defendant mining company, and continued

to hold these offices until the stock was fully paid for; that, at the time of the purchase of said stock by Barker, Armington, and Collins from the Anderson brothers, it was understood and agreed that the same should be paid for out of moneys which the purchasers might derive from the operation of the company's mines.

1. Contention is made that the evidence is insufficient to justify the findings, and particularly the finding that the stock in controversy was purchased by Armington, Barker, and Collins with their own moneys and not with moneys belonging to the company. The transaction by which the stock was acquired took place on May 9, 1896. At that time Barker and Collins were directors of the company, Barker being its president, and E. J. Anderson its secretary. E. J. Anderson and his brother. J. T. Anderson, owned 400,051 shares, and also an undivided one-sixth interest in the Ripple, Raven, and Avalanche lode claims, situate in Cascade county. The Anderson brothers on that date sold to Armington and Barker all their shares of stock and their interest in the claims mentioned, for a consideration of $20,000, to be paid as follows: $6,000 in cash, $5,000 on or before July 3d; $5,000 on or before September 3d; and $4,000 on or before November 3, 1896. For the deferred payments notes were executed, to bear interest at twelve per cent per annum after maturity. Of the stock 100,000 shares were transferred on the books and delivered immediately to Armington and Barker. The remaining 300,051 shares were, under a written agreement entered into on that day, retained by the Anderson brothers as security for the payment of the notes, as was also the title to the interest in the mining claims mentioned, with a stipulation as to the latter, however, that, upon payment of the note due on July 3d, a conveyance of the claims should be made. Collins was to have a one-third interest in the purchase, and, after it was made, he signed the notes, though he did not sign the agreement. It was understood and agreed by Armington, Barker and Collins that the notes should all be paid out of moneys derived from ores taken from the property belong-

ing to the company, they at that time owning a one-half interest in a lease of some claims belonging to it, having purchased this interest from others, presumably strangers to the company, who had theretofore leased from the company, as hereafter appears. Whether the Anderson brothers were parties to this understanding, or even cognizant of it, does not appear.

After this contract was made, E. J. Anderson resigned the secretaryship, and Armington became a director and was made secretary in his place, and thereafter he and Barker were, respectively, secretary and president of the company until final payment was made to the Anderson brothers. The $6,000 cash payment was made by Armington out of his own money. The note falling due July 3d was paid with money drawn from the treasury of the company by Armington and credited on certain notes held by Barker, Armington and Collins against the company. A payment of $3,900.33 was afterward, on July 13, 1897, made on the $4,000 note with money borrowed by Armington, Collins and Barker; but this was subsequently refunded to them out of moneys derived from ores taken out of the property of the company under the lease referred to above. The balance of this note and the $5,000 note due on September 3, 1896, amounting together to something over $7,000, were discharged by Collins about July 1, 1899, upon a compromise of a suit brought to enforce collection by the Anderson brothers; the amount actually paid being $6,000. This payment was made by Collins with his own money. Upon the payment of this sum the certificate for 300,051 shares was delivered to Lavina A. Collins, to be held by her as security for the performance of some sort of obligation to her by Armington, Barker, and Collins, the character of which does not distinctly appear.

Prior to May 9, 1896, Wydell & Churchill, a copartnership, had secured a lease from the company of some of its claims, and were engaged in working them for a stipulated royalty on the ores extracted and reduced. Collins, Barker, and Armington, some time after the lease was executed, purchased a half interest

therein, and on May 9, 1896, were engaged in taking out ore and shipping the same for their own profit, nevertheless paying to the company the royalty stipulated for in the lease.    It appears from the testimony of Collins and Armington that at some time prior to May 9, 1896, they, together with the Anderson brothers, had sold to the company the Spokane lode mining claim, taking the promissory notes of the company therefor.    They were at that time, except Armington, all directors and officers of the company.    These notes were the notes upon which they took credit to themselves for the money drawn from the treasury of the company to make the payment of the $5,000 note due July 3, 1896.

Certificate No. 571 remained unchanged from the time it was first issued until August 22, 1903, when the plaintiff purchased Collins' interest therein.    It was then mutually agreed by Armington, Barker and Collins, that Collins was entitled to 133,317 shares, J. C. E. Barker to 100,017 shares, and J. T. Armington to 66,717 shares.    This was indorsed on the back of the certificate.    Thereupon Collins indorsed the certificate in blank, and, by the consent of Barker, Armington and Lavina A. Collins, transferred the same to Violet Barker, upon payment by her of $3,000 in cash and the execution and delivery of her promissory notes for the balance of $10,500; she having on that day purchased other property from Collins, Barker and Armington, besides the stock.    Soon after this purchase by plaintiff, the certificate indorsed as shown above was, by consent of plaintiff, delivered to the sheriff of Cascade county, to be held by him with other securities in lieu of an undertaking to stay execution in a case entitled *Coombs et al.* v. *Barker et al.,* then pending on motion for a new trial in the district court of Cascade county. This was done at the instance and for the benefit of D. L. S. Barker, J. C. E. Barker and Armington, defendants in that case, who were moving for a new trial.    Subsequently, and presumably after the necessity of its retention by the sheriff had passed away, the certificate was seized under execution which came into his hands in a case entitled *Edwards* v. *J. C. E. Bar-*

*ker,* and Barker's interest in it was sold to defendant Power and one Louis Heitman. Thereupon it was delivered to defendant Gormley, as secretary, to make the transfer of the Barker interest to the purchasers. The sale by the sheriff was made after notice of plaintiff's claim.

No evidence was introduced by anyone which tended to show whether the Wydell & Churchill lease was authorized by the stockholders of the company, or whether it was granted by the trustees only. Nor does it appear what the terms of the lease were. It does appear that the sale of the Spokane claim to the company, except Armington's interest, was made by the directors of the company, all of whom were interested in the claim, without authority from the stockholders.

It seems clear that, at the time the sale was made to the plaintiff, Collins was only the equitable owner of whatever shares represented by the certificate he was entitled to. Of this fact the plaintiff was fully apprised. Since this was so, she bought only such equity as he had, and, for the purposes of this case, the principles which would have applied in order to determine Collins' rights in a controversy between him and the company are determinative of her rights also. She does not occupy the position of an innocent purchaser without notice. (Civ. Code, sec. 472.; 10 Cyc. 632.)

In equity, the directors of a corporation occupy a fiduciary relation to the corporation and its stockholders. Since they occupy this relation, they may not profit by virtue thereof at the expense of the corporation or the rights of the stockholders. They are required to exercise the utmost good faith in the discharge of the duties arising out of their trust, and to act for the corporation and its stockholders, giving all the benefit of their best judgment. If by dealing with the property of the corporation or its business for their own purposes, directly or indirectly, they derive a personal profit from it, they may be held trustees *ex maleficio,* as to such profits, for the benefit of the corporation and those stockholders who have suffered injury or deprivation

by their conduct, and be compelled to restore what they have thus converted to their own use.  (*Gerry* v. *Bismarck Bank,* 19 Mont. 191, 47 Pac. 810; *Coombs* v. *Barker,* 31 Mont. 526, 79 Pac. 1; *McConnell* v. *Combination M. & M. Co.,* 30 Mont. 239, 104 Am. St. Rep. 703, 76 Pac. 194; Id., 31 Mont. 563, 79 Pac. 248.)  And under the most favorable view of the authorities, where it appears that the directors have obtained any profit from dealing with the corporation, and the transaction is drawn in question as between them and the stockholders of the corporation, the burden is upon the directors to show that such transaction has been fair, open, and in the utmost good faith. (*Coombs* v. *Barker et al., supra.*)

Applying these principles to the facts showing the means by which the Anderson stock was obtained by Collins and his associates, can we say that the finding of the district court that they purchased it with their own money is correct, and that the transaction should be sustained as a whole?  We think not.  That they drew from the treasury of the company, directly or indirectly, $8,900.33 is clear; and since there is no proof that they had any right to do this,—for such right is not shown by the facts touching the sale by them to the company of the Spokane lode claim, by which they obtained the notes of the company,— all of the parties to that transaction, except Armington, including the Anderson brothers, being directors and constituting a majority of the board, and personally interested in the sale (*McConnell* v. *Combination M. & M. Co., supra*), they became trustees of the stock and the other property purchased with it, for the benefit of the company to the extent to which they thus used the company's funds.  Nor is the fact that they acquired an interest in the Wydell & Churchill lease, and from the profits of the ores extracted and reduced obtained a part of the funds paid to the Anderson brothers, standing alone, sufficient to remove the taint from the transaction.

Since the plaintiff stands in the shoes of Collins, the burden was upon her to show, at least, that the transaction out of which the lease grew was fair, and violated no duty owed to the com-

pany by Collins and his associates. This burden the plaintiff did not sustain, and the court should have found, as the facts show, that $8,900.33 of the funds of the corporation went to the purchase of the stock.

The result is that the president and secretary of the company, after the stock came into their hands, were entitled to retain such a proportion of it as was impressed by the trust resulting from the purchase. It makes no difference that the purchasers executed their notes and afterward paid them to the amount they did with the funds of the company. As was observed by this court in *Muller* v. *Buyck,* 12 Mont. 354, 30 Pac. 386: ''If the mere fact that defendant gave his note or notes for a portion of the purchase price in said transaction, and afterward paid said promises off with trust funds, would enable defendant to claim and hold an interest in said property, this would be a very convenient method for a fraudulently disposed trustee to pursue in putting trust funds into land, so as to hold an interest therein.'' So, here, we do not think that Collins and his associates could have insisted that, because they executed their notes for the stock in the first instance, and thereafter paid them off in part by moneys belonging to the company, no trust character was impressed upon the property which the company could enforce.

2. It is argued by appellant that the evidence shows that Collins never obtained any title, either legal or equitable, to any portion of the stock represented by the certificate. In this, however, we think appellant mistaken. If the contract with the Anderson brothers had been made by Collins alone, and he had paid the full amount of the $14,000 due on the notes executed to them out of his own funds, there could be no question but that his right to the whole amount of the stock would have been perfect, even though the certificate had been issued to another for him. Therefore, so far as he paid his own money for it,—and the evidence shows that he paid $5,099.67,—his right to the number of shares thus paid for was perfect, for the company may not be permitted to do wrong by retaining the whole amount

because a trust in its favor resulted as to a part of it.   Collins was entitled to the proportion of the shares represented by the certificate that $5,099.67 bears to the $14,000, the amount paid for the whole; for, though he actually paid $6,000 in the settlement of the suit brought by the Anderson brothers, this amount included interest due for the delay in payment after maturity of the notes, and, since he was responsible himself for the delay, the interest paid by him should be excluded from consideration.

3. What has already been said disposes of the contention that the plaintiff was not a *bona fide* purchaser without notice.   We think the statute cited *supra* conclusive upon this point.

4. The point is made that the evidence shows that the plaintiff is not the real party in interest, and that the action should have been dismissed for this reason.   There is some conflict in the evidence upon the question whether the purchase from Collins was made by the plaintiff for herself, or was only colorable and for the benefit of one David L. S. Barker.   The court resolved the question in favor of the plaintiff, and, since the evidence does not clearly preponderate against the finding, we may not disturb it.   (*Bordeaux* v. *Bordeaux,* 32 Mont. 159, 80 Pac. 6; *Finlen* v. *Heinze,* 32 Mont. 354, 80 Pac. 918.)

5. Finally, it is argued that the plaintiff has lost her right of action by laches.   In this contention there is no merit.   If the whole purchase from the Anderson brothers had been made by Collins and his associates with their own money, it would have been of no concern to the company how the stock was issued and held.   This would have been a matter of concern to the purchasers only, and the officers of the company would have been bound at any time, whenever the certificate, properly indorsed, was delivered to them, to make the transfer as they directed.   So far, therefore, as Collins was entitled to any of the stock, there being no dispute between him and his associates as to the ownership of such interest, the officers were bound to make the transfer whenever properly directed to do so, and no lapse of time would protect them against the consequences of a refusal.

The other contentions made are not of sufficient merit to require special notice.

Dividing the shares represented by the certificate according to the proportion heretofore indicated, between the plaintiff and the corporation, the plaintiff is entitled to 109,287 shares, and the corporation to the balance. The case is therefore remanded to the district court, with directions to proceed as follows: To grant the defendants a new trial, unless the plaintiff within thirty days from the date of the *remittitur* file with the clerk her written consent that the judgment may be so modified as to direct the issuance to her of 109,287 shares, in full satisfaction of her claim, but that, if such consent be filed, the judgment be modified accordingly. The order denying a new trial will then stand affirmed. The parties appellant and respondent will each pay one-half the costs.

*New trial granted nisi.*

MR. JUSTICE HOLLOWAY and MR. JUSTICE SMITH concur.

Rehearing denied April 20, 1907.